1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FIREBAUGH CANAL WATER DISTRICT, et al.,**<br><br>                   **Plaintiffs,**<br><br>     **v.**<br><br>**UNITED STATES OF AMERICA, et al.,**<br><br>                   **Defendants.** | **1:88-cv-0634-OWW**<br><br>**MEMORANDUM DECISION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. 819, 837, 892)** |

## I.  INTRODUCTION.

On October 22, 2010, Firebaugh Canal Water District and Central California Irrigation District ("Plaintiffs") filed a motion for summary judgment against the United States seeking judgment **(1)** that the United States has unlawfully withheld drainage service for the San Luis Unit, and that the United State's duty to provide drainage includes a duty to drain water and contaminants entering Plaintiffs' service areas; **(2)** that the United States' failure to install and operate drainage facilities is agency action unlawfully withheld in violation of Section 1(a)(2) and Section 5 of the San Luis Act; **(3)** that the United States has acted arbitrarily, capriciously, and not in accordance with law in refusing to install, maintain, and operate federal

**1**

drainage features in the area known as the Northerly Area and in the Northerly portion of Westlands Water District; **(4)** that a trial shall be held to determine the quantities of drainage waters and contaminants originating from irrigation within the San Luis Unit that have entered Plaintiffs' service areas, and enter an injunction requiring the United States to provide for interception, collection, and disposal of such waters and contaminants; and **(5)** that the court should schedule an order to show cause hearing. (Doc. 819 at 60-61).

On December 10, 2010, the United States Bureau of Reclamation ("Reclamation"), United States Department of the Interior ("Department"), Gail Norton, and the United States of America (collectively "Federal Defendants") filed a cross-motion for summary judgment against Plaintiffs seeking judgment that Federal Defendants have no duty to provide drainage service to land outside the San Luis Unit, that the United States is complying with its duties under the San Luis Act, and that the current drainage plan in place is not arbitrary and capricious. (Doc. 827). Westlands Water District, Panoche Water District, and Panoche Drainage District ("District Defendants") filed a cross-motion for summary judgment against Plaintiffs on December 10, 2010 seeking judgment on Plaintiffs' section 706(1) claim on the basis that there is no duty under the San Luis Act to provide drainage service to Plaintiffs' lands. (Doc. 832). District Defendants also filed opposition to Federal Defendants' motion for summary judgment on January 10, 2011. (Doc. 848). Environmental Interveners filed opposition to Plaintiffs' motion for summary judgment on December 10, 2010. (Doc. 842).

**2**

Plaintiffs replied to the cross-motions for summary judgment on January 10, 2011. (Doc. 849). Federal Defendants filed a reply in support of its motion for summary judgment on February 9, 2011. (Doc. 856). District Defendants filed a reply on February 9, 2011. (Doc. 857).

## II. **FACTUAL BACKGROUND**.

In *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000), the Ninth Circuit affirmed in part and reversed in part the court's entry of partial judgment on March 12, 1995, which required Federal Defendants to fulfill their mandatory drainage duties under the San Luis Act by pursuing a discharge permit with the State of California. The Ninth Circuit held that drainage must be provided but that the court's partial judgment improperly precluded other drainage solutions Federal Defendants are authorized to pursue under the San Luis Act and remanded this action for further proceedings.

On December 18, 2000 the partial judgment was amended to comply with the holding in *Firebaugh*. The amended partial judgment provides in pertinent part:

> FURTHER ORDERED that the Secretary of the Interior, the United States Department of the Interior, the United States Bureau of Reclamation, and each of them, and their officials, and employees, shall, without delay, provide drainage to the San Luis Unit pursuant to the statutory duty imposed by section 1(a) of the San Luis Act. The Secretary of the Interior, the United States Department of the Interior, the United States Bureau of Reclamation, and each of them, shall no later than January 29, 2001, submit to this court a detailed plan describing the action or actions, whether short term or long term, they will take to promptly provide drainage to the San Luis Unit, which plan shall contain a schedule of dates by which the action or actions described in the plan will be accomplished. Nothing contained herein is intended to divest the Secretary of the Interior, the United States Department of the Interior, or the United States Bureau

3

1
2
3
4

of Reclamation of any discretion they have to select means other than an interceptor drain to provide drainage to the San Luis Unit. Nor is anything contained herein intended to excuse the Secretary of the Interior, the United States Department of the Interior or the United States Bureau of Reclamation from complying with any applicable law.

5
6

(Doc. 654).

7
8
9
10
11
12
13
14
15
16
17
18

On April 18, 2001, Federal Defendants submitted a Plan of Action to "initiate immediately a detailed review of all reasonable alternatives for providing drainage service to lands within the San Luis Unit" and a schedule for completion to the court. (*Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB, Doc. 483).[1]   The Plan of Action called for a San Luis Drainage Feature Reevaluation ("SLDFR") to analyze feasible alternative means of providing drainage service to the San Luis Unit.   The Plan of Action also detailed short-term strategies, including continuation of the Grassland Bypass Project, a drainage program developed in 1995 based on an agreement between the United States and the San Luis & Delta-Mendota Water Authority.

19
20
21
22
23
24

The first phase of the SLDFR resulted in preparation of a report entitled "Preliminary Alternatives Report, San Luis Drainage Re-evaluation" published in December 2001 ("PAR").[2]   The PAR discussed twelve drainage service methods for treatment, concentration, disposal, and beneficial use of drain water and salts.   The PAR posited three broad conceptional categories of

25
26
27

[1] This case is a consolidation of multiple actions.   Several of the operative documents in this case are found on the separate docket for the case *Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB.

28

[2] Facts concerning Federal Defendants' course of conduct are derived from the administrative record (AR).

**4**

"Preliminary Alternatives" comprised of various combinations of the drainage service methods: (1) In-Valley Alternatives; (2) Out-of-Valley Alternatives; and (3) Beneficial Use Alternatives.

The PAR's in-Valley Alternatives provide for use of evaporation ponds and ultimate salt disposal in landfills and deep valley wells. Out-of-Valley Alternatives provide for drainage to two disposal sites: the Pacific Ocean and the San Joaquin Delta. Delta disposal generally entails selenium treatment of irrigation water before ultimate disposal in the Delta. Beneficial Use Alternatives posit use of reverse osmosis technology to produce clean water byproduct from drainage, followed by beneficial use of the clean water and/or salts produced by the process.

The second phase of the SLDFR was preparation of the "Plan Formulation Report, San Luis Drainage Feature Re-evaluation," published in December 2002. The PFR established the "In-Valley Alternative," as the proposed action based on cost, implementation time, and environmental information available. The In-Valley Alternative includes a drainwater collection system, regional drainwater reuse facilities, selenium treatment, reverse osmosis treatment for the Northerly Area, and evaporation ponds for salt disposal.

In March 2003, a combination of local water districts and contractors submitted the Westside Regional Drainage Plan ("WRDP") to Reclamation. The WRDP proposed expansion of the Grassland Bypass Project. The WRDP contemplated that each district would implement drainage control efforts appropriate for their respective needs, and that implementation of the districts' efforts would be coordinated with input from Reclamation into one comprehensive

**5**

program.   The WRDP identified key management practices as land retirement, groundwater management, source control, regional reuse projects, drain water treatment, and salt disposal.   Reclamation incorporated the WRDP into the SLDFR, effected changes to the environmental impact statement for the SLDFR, and prepared a revised Plan of Action to submit to the court.

On February 5, 2004, Federal Defendants lodged an "Amended Plan of Action for Drainage to the San Luis Unit Central Valley Project" ("Amended Plan") with the court that incorporated input from the WRDP.   The Amended Plan stated that the scope of the SLDFR was being expanded to include land retirement among the alternatives for providing drainage to the San Luis Unit.   The Amended Plan proposed an amended schedule which provided that a Final Environmental Impact Statement and Record of Decision would be completed by July 2006.   The Amended Plan also indicated that Federal Defendants would continue to support implementation of short-term measures by the WRDP proven or likely to provide drainage benefits in the short term.

Reclamation published an Addendum to the PFR ("PFR Addendum") in July 2004 that incorporated the WRDP and refined the alternatives identified in the initial PFR.   The PFR Addendum revised the number of lands needing drainage, as well as estimates of drainage quality and quantity.   The PFR Addendum included land retirement scenarios for each of the In-Valley Alternatives identified in the PFR.

Reclamation published a draft environmental impact statement on the SLDFR in May 2005.   A final environmental impact statement for the SLDFR was published in May 2006 ("EIS").   The EIS defined

the drainage study areas as the lands lying within the authorized service area of the San Luis Unit and Central Valley Project.  The drainage study area also included the Grassland Drainage Area, which encompasses lands outside the San Luis Unit–including Plaintiffs' lands.

The EIS included a National Economic Development ("NED") analysis of various land retirement scenarios proposed in the PFR and PFR Addendum.  The objective of NED analysis "is to determine the change in net value of the Nation's output of goods and services that would result from implementing each project alternative."  The EIS identified the In-Valley/Drainage-Impaired Area Land Retirement Alternative as the preferred NED Plan.  On November 27, 2006, Reclamation recommended a Secretarial Exception to select an In-Valley Alternative other than the NED Plan, citing impacts to irrigated agriculture and the regional economy.  The Secretarial Exception was approved on December 18, 2006, and Reclamation was authorized to select an In-Valley Alternative in a Record of Decision.

Reclamation approved a Record of Decision selecting the In-Valley/Water Needs Land Retirement Alternative in March 2007 ("2007 ROD").  The 2007 ROD defines drainage service as "managing the regional shallow groundwater from the root zone of drainage-impacted lands and/or reducing contributions of water to the shallow groundwater table through land retirement."  Since 2007, Federal Defendants have submitted periodic status reports to the court outlining their efforts to comply with the drainage duty imposed by the San Luis Act.  Primarily, Federal Defendants status reports have described various studies, discussions, and requests

**7**

for congressional action effected in connection with the Federal Defendants' endeavor to provide drainage to the San Luis Unit.

Reclamation completed the SLDFR Feasibility Study in March 2008. The 2008 Feasibility Study estimated the total cost of construction of the In-Valley/Water Needs Land Retirement Alternative to be 2.69 billion dollars. Reclamation transmitted the 2008 Feasability Report to Congress on July 8, 2008.

On November 18, 2009, Federal Defendants submitted a Control Schedule ("Control Schedule") describing the actions Reclamation intended to take to comply with the 2007 ROD. After discussing the Control Schedule with the parties at a scheduling conference, the court issued an order which provides:

> Federal Defendants, through the Bureau of Reclamation, shall perform their undertakings to the Court, as presented in Part I of the Parties' Supplemental Status Report (Doc. 752) including the Control Schedule attached thereto, as the Bureau of Reclamation has proposed to perform them. Nothing in this Order precludes the Federal Defendants from discussing with other Parties alternative means or locations of providing drainage service within the San Luis Unit. Any modifications based on such discussions shall be separately identified in the status reports filed with this Court

(Doc. 758, "Scheduling Order").

Federal Defendants submitted their most recent status report on April 1, 2011. (Doc. 864). The April 2011 Status Report identifies the following actions currently underway in connection with provision of drainage to the San Luis Unit:

> 1) Reclamation has continued to carry out the activities specified in the Control Schedule, in the manner and on the schedule set forth in the Control Schedule.
>
> 2) Reclamation has requested appropriations in the amount of $14,250,000 to continue implementation of actions identified in the Control Schedule for the 2012 fiscal year;

**8**

3)   Reclamation continues to undertake actions provided in the ROD in accordance with the schedule of activities and budget described in the Control Schedule.  Most of these actions are prerequisites to the construction of a demonstration treatment plant, to be located in the Panoche Drainage District, which will collect data needed for the final design of the reverse osmosis and selenium bio-treatment components of drainage service to be constructed in the San Luis Unit.

4) Beginning in December 2009, Reclamation initiated the process for securing a repayment contract with Westlands for the recovery of costs of construction of drainage facilities in Westlands.

5) Reclamation continues to support, through grants, cooperative agreements, and other means, drainage projects requested by districts in the San Luis Unit.

6)   Reclamation and the San Luis & Delta-Mendota Water Authority, on behalf of the Grassland Basin Drainers, continue to implement the December 2009 Agreement For Continued Use of the San Luis Drain ("Third Use Agreement" ) that will allow the Grassland Bypass Project to continue through December 2019.

(Doc. 864).

The court heard the parties cross-motions for summary judgment on May 20, 2011.  During the May 2011 summary judgment hearing, counsel advised the court that Federal Defendants were contemplating potential modifications to the Control Schedule.  The court indicated that the appropriate procedural mechanism would be a motion requesting modification of the Scheduling Order and Control Schedule in order to afford all parties an opportunity to be heard on the matter.  District Defendants filed a motion to modify the scheduling order on June 15, 2011.  (Doc. 876).  The parties have been heard on the matter.  An order granting the motion issues concurrently with this memorandum decision.

///

///

**IV. <u>DISCUSSION</u>**.

**A. Standing**

     To invoke the jurisdiction of the federal courts, a plaintiff must demonstrate standing under Article III of the United States Constitution. *E.g., L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The three requirements of the irreducible constitutional minimum of standing are: (1) the plaintiff must have suffered an "injury in fact;" (2) there must be a causal connection between the injury and the conduct complained of, i.e., the injury has to be "fairly traceable" to the challenged action of the defendant; and (3) it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *E.g., Lujan*, 504 U.S. at 560 (citations omitted). A party's standing to seek judicial review of administrative action is typically "self-evident" when the party is the object of the administrative action. *L.A. Haven Hospice*, 638 F.3d at 655 (citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003)). Standing is substantially more difficult to establish where the challenged agency action neither requires nor forbids any action on the part of the complaining party. *Id*. (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, ___, 129 S.Ct. 1142, 1149 (2009)).

     District Defendants contend that Plaintiffs have not demonstrated Article III standing, and that trial is necessary to determine standing because District Defendants dispute Plaintiffs' theory of harm. District Defendants misapprehend Plaintiffs' burden of going forward at the summary judgment stage. The Supreme

**10**

Court has described a plaintiff's burden of proving standing at

various stages of a case as follows:

> Since [the standing elements] are not mere pleading
> requirements but rather an indispensable part of the
> plaintiff's case, each element must be supported in the
> same way as any other matter on which the plaintiff bears
> the burden of proof, i.e., with the manner and degree of
> evidence required at the successive stages of the
> litigation. At the pleading stage, general factual
> allegations of injury resulting from the defendant's
> conduct may suffice, for on a motion to dismiss we
> presume that general allegations embrace those specific
> facts that are necessary to support the claim. In
> response to a summary judgment motion, however, the
> plaintiff can no longer rest on such "mere allegations,"
> but must "set forth" by affidavit or other evidence
> "specific facts," Fed. Rule Civ. Proc. 56(e), which for
> purposes of the summary judgment motion will be taken to
> be true. And at the final stage, those facts (if
> controverted) must be supported adequately by the
> evidence adduced at trial.

*Lujan*, 504 U.S. at 561; *see also Churchill County v. Babbitt*, 150

F.3d 1072, 1077 (9th Cir. 1998).

Plaintiffs have submitted sufficient evidence of specific

facts which, taken as true, establish actual harm resulting from

Federal Defendants' failure to provide required drainage service to

the San Luis Unit. (Doc. 820, Plaintiffs' SUMF Nos. 4 and 5).

Although both District Defendants and Federal Defendants purport to

dispute Plaintiffs' evidence, (Docs. 829 and 835), the arguments

advanced in the parties' respective responses to Plaintiffs'

statement of undisputed material facts do not defeat Plaintiffs'

evidence under the burden applicable at the summary judgment stage.

*See Lujan*, 504 U.S. at 561. Plaintiffs have set forth evidence of

specific facts, which, taken as true, is sufficient to support

Plaintiffs' standing at this stage in the proceedings. Although

factual disputes may exist concerning *the extent* to which drainage

waters from the San Luis Unit impact Plaintiff's land, such factual disputes do not deprive Plaintiffs of Article III standing at the summary judgment stage. There is a justiciable controversy regarding the nature, scope, and performance of Federal Defendants' drainage duty under the San Luis Act and whether the legally required drainage duty is being implemented.

Plaintiffs contend that the court's prior analysis regarding standing supports their substantive claim that the San Luis Act imposes a mandatory duty to drain Plaintiffs' lands; this argument is premised on a fundamental misunderstanding of the court's prior orders and the law of standing. The court's November 2004 Memorandum Opinion and Order re: Motions to Dismiss the Fifth Amended Complaint found that Plaintiffs have standing because the interest they assert "bears a 'plausible relationship to the policies underlying [the San Luis Act].'" (*Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB, November 19, 2004 Memorandum Opinion and Order, Doc. 948 at 33) (citing, *Clarke*, 479 U.S. at 395)). The 2004 Memorandum Decision found:

> Plaintiffs seek to protect an interest in having a drainage solution implemented in a timely fashion so that their lands will no longer be harmed by the down-gradient flow of contaminated groundwater. In crafting § 1(a)(2) of the Act, Congress did at least contemplate that irrigation within the San Luis Unit might cause drainage problems to lands outside the Unit. It also appears that Congress thought of the drainage as an integrated system that would benefit others beyond the San Luis Unit, and Congress relied upon the pressure those outside interests would put on the State of California to assume the burden of constructing the drain. Recognizing that the zone of interest test "is not meant to be especially demanding... and there need be no indication of congressional purpose to benefit the would-be plaintiff," Plaintiffs' APA claim (that the Federal Defendants have unreasonably delayed or unlawfully withheld agency action) does fall within the

zone of interest of the San Luis Act.  Plaintiffs have
standing to bring their APA claim.

*Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*,
1:91-cv-00048-OWW-DLB, November 19, 2004 Memorandum Opinion and
Order, Doc. 948 at 40-41.

Contrary to Plaintiffs' contention, the fact that Plaintiffs
have a right to seek relief under the zone of interest test does
not suggest a right to seek or entitlement to any particular *form*
of relief.  That Plaintiffs have zone of interest standing only
means that if Federal Defendants' drainage acts or omissions are
harming Plaintiffs, prevailing in this action is likely to redress
Plaintiffs' injury.  This does not establish that all of
Plaintiffs' injuries can be redressed by a favorable ruling in this
case.

**B.  *Chevron* Deference**

Plaintiffs' claims require review of Federal Defendants'
construction of the San Luis Act.  Federal Defendants interpret the
San Luis Act as not requiring Federal Defendants "to provide
drainage service to non-San Luis Unit lands, or to 'collect,
intercept, dispose of and control' drainwater, after that
drainwater has allegedly flowed downslope into Plaintiffs' service
areas."  (See Doc. 827 at 14, Federal Defendants' MSJ).

When a court reviews an agency's construction of the statute
which it administers, it is confronted with two questions.
*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984).
First, the court must determine whether Congress has directly
spoken to the precise question at issue; if so, the court must give
effect to the unambiguously expressed intent of Congress.  *Id*.  If

the statute is silent or ambiguous with respect to the specific issue, the court proceeds to a second inquiry: whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843.

### 1. Step One: Statutory Language

Step one of the *Chevron* analysis requires the court to evaluate the language of the San Luis Act using "traditional tools of statutory construction." *E.g.*, *Ass'n of Irritated Residents v. United States EPA*, 632 F.3d 584, 596 (9th Cir. 2011). "In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Neither section 1(a)(2) of the San Luis Act nor any other provision directly addresses the issue of whether the San Luis Act imposes a mandatory duty to provide drainage service to areas outside the San Luis Unit in order to remediate damage caused by operation of the Unit.

Plaintiffs contend that a 1956 Department of the Interior report entitled "San Luis Unit, Central Valley Project" ("1956 Feasibility Report"), which is incorporated by reference in the San Luis Act, establishes an express directive to provide drainage to areas outside the geographic boundaries of the Unit. (Doc. 817, Plaintiffs' MSJ at 11-12). However, the San Luis Act mandates provision of drainage service "designed to meet the drainage requirements...as *generally* outlined in the [1956 Feasibility Report]." 86 P.L. 488; 74 Stat. 156 (1960) (emphasis added). The plain meaning of the word "generally" belies the notion that the

**14**

1956 Feasibility Report's various recommendations are tantamount to express directives.  The word "generally" means "in a general sense or manner; in general terms; *without reference to individuals or particulars*. Opposed to specially or particularly." Oxford English Dictionary, Second Edition, http://www.oed.com, (last visited September 26, 2011) (emphasis added); *accord* Marriam-Webster's Dictionary, Eleventh Edition, http://m-w.com, (last accessed September 26, 2011)("a : in disregard of specific instances and with regard to an overall picture <generally speaking> b : as a rule : usually").

The San Luis Act's general reference to the 1956 Feasibility Report is insufficient to transform everything discussed in the Report into an express congressional directive for purposes of the *Chevron* analysis.  As the Ninth Circuit noted, Congress has granted Federal Defendants broad discretion to meet is drainage obligations under the San Luis Act.  *See Firebaugh*, 203 F.3d at 578 (noting that Congressional action subsquent to enactment of San Luis Act has conferred substantial discretion on the Department of Interior).  As the Court of Appeal found that congressional action abrogated the duty to provide the interceptor drain contemplated in the 1956 Feasibility Report, the 1956 Feasibility Report cannot be invoked to establish express directives for *Chevron* purposes under the current embodiment of the San Luis Act.  The *Chevron* analysis proceeds to step two.

### 2. Step Two: Federal Defendants' Construction

The San Luis Act is comprised of the 1960 Act and the subsequent appropriations riders amending the Act.  The starting point for determining whether Federal Defendants' construction of

the current embodiment of the San Luis Act is permissible is interpretation of the original Act passed in 1960. *See Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) ("When Congress modifies a statute by an appropriations measure...the agency administering the statute is required to effectuate the original statutory scheme as much as possible"); *see also Firebaugh,* 203 F.3d at 577 (citing *Adams,* 556 F.2d at 50 for the proposition that originally imposed drainage duty under San Luis Act remains, subject to modifications effected by appropriations riders).

### a. Duty Under the 1960 Enactment

Congress provided express drainage directives when it passed the San Luis Act in 1960.  *See Firebaugh*, 203 F.3d at 574. Section(1)(a)(2) of the San Luis Act "expresses a clear indication that either the State of California or the Department of the Interior shall provide a drainage plan prior to construction of the San Luis Unit."  *Id.*  Section (1)(a) of the San Luis Act provides in part:

> Construction of the San Luis unit shall not be commenced until the Secretary has...received satisfactory assurance from the State of California that it will make provision for a master drainage outlet and disposal channel for the San Joqauine Valley, as generally outlined in the California water plan, Bulletin Numbered 3, of the California Department of Water Resources, which will adequately serve, by connection therewith, the drainage system for the San Luis unit **or** *has made provision for constructing the San Luis interceptor drain to the delta designed to meet the drainage requirements of the San Luis unit as generally outlined in the report of the Department of the Interior, entitled "San Luis Unit, Central Valley Project," dated December 17, 1956.*

86 P.L. 488; 74 Stat. 156 (1960) (emphasis added).  California eliminated one of the two drainage options contemplated in the section 1(a)(2) when it notified the Secretary that it would not

provide a master drain for the San Joaquin Valley.  Accordingly, when the Secretary decided to proceed with construction of the San Luis Unit, it assumed a mandatory duty to provide the interceptor drain.  *Firebaugh,* 203 F.3d at 574. Ascertaining the nature of Federal Defendants' original duty to provide the interceptor drain under section 1(a)(2) is critical to determining the scope of Federal Defendants' current duty, as subsequent Congressional action replaced the duty to provide the interceptor drain with a duty to provide comparable drainage through alternative means. *See id.*

The plain language of the section 1(a)(2) does not suggest a duty to provide drainage service to areas outside the San Luis Unit via the interceptor drain.  Section 1(a)(2) required the Secretary to make "provision for constructing the San Luis interceptor drain to the delta designed to meet *the drainage requirements of the San Luis unit*."  86 P.L. 488; 74 Stat. 156 (emphasis added).  The phrase "to meet the drainage requirements of the San Luis unit" specifically describes the purpose of the interceptor drain contemplated by Congress.  The word "requirement" means "a thing that is needed or wanted; a thing that is compulsory; a necessary condition."  Oxford English Dictionary, Second Edition, http://www.oed.com, (last visited September 26, 2011); *accord* Marriam-Webster's Dictionary, Eleventh Edition, http://m-w.com, (last accessed September 26, 2011)(defining "requirement" as "a. something wanted or needed; necessity; b. something essential to the existence or occurrence of something else: condition").  Affording the word "requirements" its ordinary and plain meaning, the phrase "drainage requirements of the San Luis Unit" means

**17**

drainage needs of the San Luis Unit; it does not mention, much less require, that the interceptor drain be capable of providing drainage to other areas or remediating harm caused by operation of the Unit.

Plaintiffs argue that the clause "drainage requirements of the San Luis unit" in section 1(a)(2) is qualified by the phrase "as generally outlined in the report of the Department of the Interior, entitled 'San Luis Unit, Central Valley Project,' dated December 17, 1956."   86 P.L. 488; 74 Stat. 156.  Plaintiffs contend that the 1956 Feasibility Report contemplated provision of drainage outside the unit.  Plaintiffs argue:

> (a) Collection is required to prevent ". . . a general drainage problem along the lower, or eastern, edge of the service area and perhaps in a few isolated spots elsewhere." ... Project Feasibility Report, AR Doc. #815 at Bates 38800 (p. 22 of report).

> (b) Rising water levels must be controlled by drains to avoid serious drainage problems along the lower edge of the service area. "Collection" and "interception" are required to protect the areas not just within the San Luis Unit but "along the lower edge of the service area." Project Feasibility Report, at AR 815:38819

> (c) Drainage will "lower the water table which otherwise ultimately might stand in the root zone or on the surface near the lower end of the service area.." Project Feasibility Report, at AR 815:38821 (p. 39 of report).

> (d) Drainage ". . . will remove water of poorer quality and thus maintain an overall acceptable quality of groundwater and soils." Project Feasibility Report, at AR 815:38846 (p. 60 of report). Uncontroverted Fact No. 9 (Report sections quoted in subparagraphs 2, 4 and 5).

> (e) "Soils of the area which will be served by the San Luis Unit contain salts which will be dissolved and carried by the percolating water into the soils in the lower parts of the service area." "The construction of a drainage system will lower the groundwater table and prevent the concentration of salts . . . it will be necessary to provide facilities for disposing of these waters." Project Feasibility Report, at AR 815:38846 (p. 60 of report).

(Doc. 819, Plaintiffs' MSJ at 11-12).

The language from the 1956 Feasibility Report relied on by Plaintiffs does not support their position. First, the 1956 Feasibility Report clearly discusses the drainage needs entailed by the San Luis Unit by reference to the federal service area's geographical boundaries; i.e., the "lower, or eastern *edge* of the service area." (Id., emphasis added). Second, the 1956 Feasibility Report's discussion of the "water table which otherwise ultimately might stand in the root zone" must be understood in the context of the primary purpose of the San Luis Act: irrigation of the federal service area. (Id.). Third, the 1956 Feasibility Report expressly references "soils of the [federal service area]." (Id.). The 1956 Feasibility Report does not suggest that the interceptor drain was intended to serve areas other than the federal service area. The fact that the interceptor drain could have provided incidental or secondary benefits to areas other than the federal service area does not mean that the purpose of the interceptor drain was to provide drainage to areas other than the federal service area. Further, the 1956 Feasibility Report is incorporated into the San Luis Act "generally" and thus cannot be read to impose mandatory duties to perform each of the discrete tasks discussed in the Report. Moreover, the duty to generally implement the drainage contemplated by the 1956 Feasibility Report was modified by congressional action subsequent to the passage of the San Luis Act. *Firebaugh,* 203 F.3d at 577.

The duty imposed by section 1(a)(2) must be construed in the context of its placement in the overall statutory scheme set forth in the San Luis Act. *See, e.g., Brown & Williamson*, 529 U.S. at 133

(discussing need to evaluate statutory provisions in view of the statute "as a whole" and in light of statute's "core objectives"); *see also Ass'n of Irritated Residents,* 632 F.3d at 596 (same, citing *Brown & Williamson*, 632 U.S. at 596)).   The balance of section 1(a) and section 5 of the San Luis Act support the conclusion that section 1(a)(2) did not require the interceptor drain to be capable of providing drainage to areas outside the San Luis Unit.

Section 1(a) of the San Luis Act describes the "principal engineering features of the San Luis Unit" as

> a dam and reservoir at or near the San Luis site, a forebay and afterbay, the San Luis Canal, the Pleasant Valley Canal, and necessary pumping plants, distribution systems, **drains,** channels, levees, flood works, and related facilities.

86 P.L. 488; 74 Stat. 156.  Congress intended for certain of the San Luis Unit's principal engineering features to be "for joint use with the State of California."  86 P.L. 488; 74 Stat. 156.  Section 1(a) authorized, but did not require, the Secretary to construct joint-use facilities "to the capacities necessary to serve both the Federal San Luis unit service area and the State's service area." *Id*. Critically, Congress did not designate the San Luis Unit's "necessary drains" as joint-use facilities.  *See id*.

Section 1(a) limits joint-use facilities to "the dam and reservoir at or near the San Luis site, forebay and afterbay, pumping plants, and the San Luis Canal." *Id.*  The fact that Congress did not designate the "necessary drains" required by section 1(a) as joint-use facilities reveals that Congress did not intend to require the "necessary drains" discussed in section 1(a)

to provide drainage service to areas outside the San Luis Unit. Section 1(a) did not require joint-use facilities to be constructed with capacities necessary to serve areas other than the federal service area. *A fortiori*, Congress did not intend to require section 1(a)'s "necessary drains," which were not designated as joint-use facilities, to be designed to do more than provide drainage for the federal service area.

Section 1(a) also demonstrates that when Congress contemplates creating infrastructure designed to serve areas outside the San Luis Unit, it knows how to say and do so. It would be anomalous to interpret the phrase "drainage requirements of the San Luis Unit" in section 1(a)(2) as having a broader scope and meaning than the "necessary drains" required by section 1(a), particularly in light of the Ninth Circuit's holding that the term "necessary...drains" in section 1(a) encompasses the interceptor drain. *Firebaugh*, 203 F.3d at 574. A court must interpret a statute "as a symmetrical and coherent regulatory scheme," and "fit, if possible, all parts into an harmonious whole." *E.g., Brown & Williamson*, 529 U.S. at 133.

Section 5 of the San Luis Act reenforces the conclusion that the original drainage duty imposed by section 1(a)(2) was limited to the federal service area. Section 5 of the San Luis Act contemplates that operation of the San Luis Unit could increase drainage requirements in the general area surrounding the Unit notwithstanding provision for the interceptor drain. Section 5 provides, in pertinent part:

> In constructing, operating, and maintaining a drainage
> system for the San Luis unit, the Secretary is ...
> authorized to enter into agreements and participate in

**21**

1
2
3

> construction and operation of drainage facilities designed to serve the general area of which the lands to be served by the San Luis unit are a part, to the extent the works authorized in section 1 of this Act contribute to drainage requirements of said area.

4 86 P.L. 488; 74 Stat. 156. In contrast to the duty under section

5 1(a)(2) to provide an interceptor drain "designed to meet the

6 drainage requirements of the San Luis Unit," section 5 discusses

7 drainage "designed to serve *the general area* of which the lands to

8 be served by the San Luis unit are a part." *Id.* (emphasis added).

9 Section 5 reveals that Congress did not intend for the interceptor

10 drain to "serve the general area" surrounding the San Luis Unit.

11 *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I,*

12 *Inc.*, 543 U.S. 111, 118 (2004) (applying presumption that "if

13 Congress includes particular language in one section of a statute

14 but omits it in another, Congress acted intentionally in that

15 exclusion").   Juxtaposition of section 1(a)(2) with section 5

16 establishes that Congress clearly drew a distinction between a

17 drainage system designed to meet the requirements of the San Luis

18 Unit (originally, the interceptor drain) and a drainage system

19 designed to alleviate increased drainage requirements of the

20 general area caused by operation of the San Luis Unit.   The

21 permissive language of section 5 defeats the interpretation that

22 the San Luis Act, as enacted in 1960, imposed a mandatory duty to

23 provide drainage to areas outside the San Luis Unit or to remediate

24 adverse effects outside the Unit's boundaries caused by operation

25 of the Unit.[3]

26
27
28

---

[3] It is clear that at the time section 1(a)(2) was passed in 1960, Congress did not contemplate operation of the Unit for decades without provision of the interceptor drain.  To the Contrary, Congress commanded that if the interceptor drain was not provided, the Unit could not be constructed.

### b.   Duty After Amendment of the San Luis Act

After construction of the San Luis Unit commenced, Congress abrogated its specific command to provide the interceptor drain through a series of enactments that authorized the Secretary to pursue "other, non interceptor drain, solutions to the drainage duty created by the San Luis Act." *Firebaugh,* 203 F.3d at 578.   In 1965, Congress began including language in the Department of the Interior's annual appropriations acts that prohibited the Secretary from completing the interceptor drain until formulation of a plan with the State of California "to minimize the detrimental effect of the San Luis Drainage waters." *Id*. at 574-75 (quoting Pub. L. No. 105-62, § 510(a), 111 Stat. 1320, 1340 (1997)).[4]   In the late 1970s, Congress began appropriating funds to enable the Bureau of Reclamation to examine alternate drainage solutions in cooperation with the State, local water districts, and other entities. *Id*. at 577 (citing "Reclamation Wastewater and Groundwater Study and Facilities Act of 1992", Pub. L. No. 102-575, §§ 1601-1617, 106 Stat. 4600, 4663 (1992) (enacting 43 U.S.C. §§ 390h to 390h-15 (West Supp. 1997); "Central Valley Project Improvement Act", *id*. at §§ 3401-3411, 106 Stat. 4600, 4706)).   Congress's actions "supplement[ed] the drainage solutions available to the Department of the Interior," supplanting the San Luis Act's original specific command to provide the interceptor drain with a new and different

---

[4] "None of the funds appropriated or otherwise made available by this Act may be used to determine the final point of discharge for the interceptor drain for the San Luis Unit until development by the Secretary of the Interior and the State of California of a plan, which shall conform with the water quality standards of the State of California as approved by the Administrator of the Environmental Protection Agency, to minimize any detrimental effect of the San Luis drainage waters."   Pub. L. No. 105-62, § 510(a), 111 Stat. 1320, 1340 (1997).

command directing the Secretary to exercise discretion to "creat[e] and implement[] a drainage solution for the San Luis Unit." *Firebaugh*, 203 F.3d at 577.

Congress's amendments to the San Luis Act granted the Secretary "broad discretion" to craft a drainage solution to meet its duty to provide drainage under the San Luis Act. *See id.* The Secretary's discretion is constrained, however, by the Congressional intent underlying the original command to provide the interceptor drain–to furnish a drainage solution "designed to meet the requirements of the San Luis Unit."[5] *See, e.g., Adams*, 556 F.2d at 50 ("When Congress modifies a statute by an appropriations measure...the agency administering the statute is required to effectuate the original statutory scheme as much as possible")*; see also Firebaugh,* 203 F.3d at 577 (citing *Adams,* 556 F.2d at 50 for the proposition that originally imposed drainage duty under San Luis Act remained, subject to modifications effected by appropriations riders). The Secretary's discretion is further constrained by Congress's "clear and manifest intention" that the Secretary "develop a plan that addresses the environmental problems posed by the discharge of agricultural effluent." *Firebaugh,* 203 F.3d at 575.

Despite the limits on the Secretary's discretion that can be gleaned from language of the appropriations riders, it cannot be said that the San Luis Act as amended by the appropriations riders clearly requires provision of drainage service to areas outside the

---

[5] "Drainage requirements of the San Luis Unit" is not a static concept. The amount of drainage required is necessarily linked to the amount of irrigation provided to the San Luis Unit.

San Luis Unit or remediation of damage caused by the Unit's operation for over four decades without necessary drainage.

### c. Permissibility of the Secretary's Interpretation

An agency's interpretation of a statute is permissible unless it is "arbitrary, capricious, or manifestly contrary to the statute." *E.g.*, *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009) (citing *Chevron*). Here, Federal Defendants' interpretation of the San Luis Act is permissible, as it is based on analysis of the statute's plain language and the purpose of the statutory scheme the San Luis Act embodies. Federal Defendants acknowledge that the San Luis Act imposes a mandatory duty to provide necessary drainage to the San Luis Unit, and their interpretation of the contours and limits of this duty is based on permissible statutory construction.

Federal Defendants have interpreted the San Luis Act as imposing no mandatory duty to provide drainage service outside the Unit or to remediate damage caused by past operations of the Unit; this interpretation is reasonable, lawful, and entitled to deference under *Chevron*. Whether Federal Defendants are currently complying with the duty they have permissibly construed presents a separate question.

## C. Review Under the Administrative Procedures Act

The Administrative Procedures Act ("APA") authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Pursuant to section 706 of the APA, a court is authorized to

(1) compel agency action unlawfully withheld or

unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." Id. § 706.
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

**1. 706(2) Claim**

The parties dispute whether a claim under section 706(2) survived the pleading phase of this action. A November 19, 2004, Memorandum Decision held that "the [Fifth Amended Complaint] clearly puts the Federal Defendants on notice that Plaintiffs are invoking 706(1), *the only plausible basis for their claim*." *Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB, Doc. 948.   As noted in the 2004 Memorandum Decision, the Fifth Amended Complaint does not provide fair notice of any claim under section 706(2).   Although the Fifth Amended Complaint alleges that Federal Defendants actions are "arbitrary, capricious, and contrary to law," the gravamen of the APA claim advanced in the Fifth Amended Complaint is that Federal Defendants are unlawfully withholding discrete agency action required by law; this type of claim invokes section 706(1), not 706(2).   *See Ass'n of Civilian Technicians, Inc. v. United States*, 601 F. Supp. 2d 146, 166 (D. D.C. 2009) ("While section 706(1) of the APA permits

26

1  a court to compel agency action unlawfully withheld, section 706(2)

2  by contrast authorizes a reviewing court to "hold unlawful and set

3  aside agency action, findings, and conclusions found to be . . .

4  arbitrary, capricious, an abuse of discretion, or otherwise not in

5  accordance with law."); *compare Hells Canyon Preservation Counsel*

6  *v. United States Forest Service*, 593 F.3d 923, 933 (9th Cir. 2010)

7  (noting that claim seeking to compel Forest Service to re-define

8  boundary description was better phrased as a section 706(2) claim

9  than a 706(1) claim, as Forest Service had already acted to define

10 boundary) *with Firebaugh,* 203 F.3d at 577 (holding that Plaintiffs'

11 claim that Federal Defendants were failing to provide drainage

12 required by San Luis Act was redressable under section 706(1) as

13 action "unreasonably delayed").

14    Even if the Fifth Amended Complaint is sufficient to state a

15 section 706(2) claim, since 2004, the parties have proceeded to

16 litigate this action under the assumption that only a section

17 706(1) claim remains at issue in this case.   As recently as

18 September 2010, a Memorandum Decision Re: Plaintiffs' Motion to

19 Supplement the Administrative Record held:

20        The *sole remaining claim* against Federal Defendants in
          this   case   concerns   the   Bureau   of   Reclamation's
21        ("Reclamation"   or   "Bureau")   alleged   failure   to
          provide drainage service to the San Luis Unit pursuant to
22        Section 1(a) of the San Luis Act. See 1:91-cv-0048 OWW
          DLB, Nov. 19, 2004 Mem. Dec. ("11/19/04 Decision") at 25,
23        28-29, 36, 42. This claim arises under Section 706(1) of
          the Administrative Procedure Act ("APA"), 5 USC § 706(1),
24        which permits a reviewing court to "compel agency action
          unlawfully withheld or unreasonably delayed.
25
26 (Doc. 806 at 2).    The 2010 Memorandum Decision also recognized

27 that "it is undisputed that only an APA Section 706(1) claim

28 remains in this case." (Id. at 6).   Plaintiffs did not express an

**27**

objection to this finding.  Plaintiffs' belated attempt to reinvent a section 706(2) claim is foreclosed.

Assuming *arguendo* that Plaintiffs had a viable claim under section 706(2), Defendants are entitled to summary judgment on the claim Plaintiffs' have articulated.  Plaintiffs' motion for summary judgment clarifies that any 706(2) claim is based on their contention that "Federal Defendants refusal to accept that the duty included in section 1(a)(2) of the San Luis Act includes the duty to intercept, collect, dispose of, and control San Luis Drainage waters once those waters escape the Unit...may be set aside as arbitrary and capricious under Section 706(2)(a)."  (Doc. 819, Plaintiff's MSJ at 41).   Plaintiffs argue that

> any interpretation of the San Luis Act, or implementation of a drainage system that does not provide for the United State's responsibility for each of the elements of collection, inteception, disposal, and control of downslope migration of water and the effects of pressure transmitted downslope due to a lack of drainage of the San Luis Unit lands, for the past 40 years while irrigation of the San Luis Unit lands with CVP water occurred, and subsequent harm to the surrounding environment, must be set aside as arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

(Doc. 819, Plaintiffs' MSJ at 43).  Plaintiffs' challenge as to Federal Defendants statutory construction of the San Luis Act has been decided against Plaintiffs.  No mandatory drainage or other remedial duty to Plaintiffs exists under the San Luis Act.

Plaintiffs' attempt to establish a claim under section 706(2) based on Federal Defendants' interpretation of the San Luis Act fails, as the Secretary's interpretation is permissible for all the reasons stated above.

///

**2. Section 706(1) Claim**

The APA provides relief for a failure to act in section 706(1). *E.g.*, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) ("SUWA").  The only agency action that can be compelled under the APA is action legally required.  *Id.*  A failure to act claim under § 706(1) can succeed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is legally required to take.  *Id*. at 64.

**a. Scope of Plaintiffs' Remaining section 706(1) Claim**

Pursuant to the November 19, 2004 Memorandum Decision Re: Motion to Dismiss the Fifth Amended Complaint and the 2010 Memorandum Decision Re: Expansion of the Administrative Record, Plaintiffs may not challenge the form and substance of the drainage solution Federal Defendants have adopted:

> Plaintiffs' 706(1) claim regarding the drainage obligation was distinguished from SUWA because:
>
> > Here, Congress has given a statutory command to provide a drainage solution for the San Luis Unit. The Ninth Circuit has determined there has been a failure by the Federal Defendants to provide such a solution. <u>Plaintiffs do not challenge the form of the drainage solution, a challenge that might be precluded under SUWA, but rather that Federal Defendants have failed to provide any drainage solution</u>. Plaintiffs § 706 unreasonable delay claim is not barred by the final agency action doctrine.
>
> Id. at 28-29.2 Plaintiffs did not seek reconsideration of this ruling.
>
> To the extent Plaintiffs offer these [] documents to prove that the drainage solution the Bureau plans to implement will not prevent impaired groundwater from migrating under their downslope lands, their challenge is to the form of the drainage solution, a use expressly disclaimed by the 11/19/04 Decision.

(Doc. 806 at 8-9).

Much of the injunctive relief sought in the Fifth Amended complaint is foreclosed by the limits imposed under section 706(1) and the Supreme Court's holding in SUWA.  542 U.S. at 62.  The Fifth Amended Complaint seeks imposition of an order requiring:

> that Federal Defendants manage and/or require the management of the San Luis Unit as follows:
> a) by determining and measuring the amounts of water moving into the downslope areas;
> b) by immediately implementing plans to stop migration of groundwater...from the San Luis Unit...across the Firebaugh boundary.  Such plans include, but are not limited to
> (1) regional and field level management practices
> (2) installation of perimeter drains to intercept the drainage flow;
> (3) installation of shallow wells...
> (4) redistrubution of available drainage loading capacities...
> (5) compensation for costs of [Plaintiffs] to handle drainage...
> (c) by...providing for [] measures and payments

*Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB, Doc. 930.  Plaintiffs also seek to require the Secretary "to provide drainage service at no cost to the general area of the lands to be served by the San Luis Act." (Id.).

A court is not authorized under section 706(1) to micro-manage Federal Defendants' performance of their duties under the San Luis Act under section 706(1).  Rather, the court's power is limited to ordering Federal Defendants to perform a discrete duty required by law.  *E.g.*, *SUWA*, 542 U.S. at 62.  The court may order the Secretary to provide drainage required by the San Luis Act, but may not prescribe how.  *Firebaugh*, 203 F.3d at 578.  The San Luis Act is mandatory as to the drainage objective to be achieved, but leaves to the Secretary substantial discretion in deciding how to

achieve it. *Id.*

The one viable claim for injunctive relief requested in the Fifth Amended Complaint is Plaintiffs' request for general relief requiring the Secretary to comply with its drainage duties under the San Luis Act.  As the 2004 Memorandum Decision Re: Motion to Dismiss the Fifth Amended Complaint recognized, "[Plaintiffs] request general relief, i.e., a drainage solution and relief from delay. [The Fifth Amended Complaint's ] many prayers for specific relief....cannot stand under...the APA." *Sumner Peck Ranch, Inc. et al., v. Department of Interior, et al.*, 1:91-cv-00048-OWW-DLB, Doc. 948.  Whether Plaintiffs are entitled to summary judgment on their claim for general injunctive relief turns on whether Federal Defendants are currently performing their duty to provide drainage under the Act.

### b. Plaintiffs' Unreasonable Delay Claim

Plaintiffs seeks summary judgment that Federal Defendants are unreasonably delaying drainage service in violation of section 706(1).  Plaintiffs also contend that Federal Defendants are subject to contempt proceedings for failing to comply with the court's modified judgment requiring provision of drainage service to the Unite.  Federal Defendants contend they are complying with the 2007 ROD, the Control Schedule, and the court's orders to the extent of their authority and appropriations.

The last status report filed by Federal Defendants was submitted on April 1, 2011. The report details various measures undertaken and performed by the Federal Defendants to provide drainage to the San Luis Unit.  *Inter alia*, the April 2011 Status Report provides that Federal Defendants are complying with the

Control Schedule for the 2007 ROD submitted to the court in 2009, including taking the requisite steps necessary to construct a demonstration treatment plant located in the Panoche Drainage District to collect data needed for the final design of the reverse osmosis and selenium bio-treatment components of the drainage service to be constructed in the San Luis Unit.

Federal Defendants have also requested Congressional appropriations in the amount of $14,250,000 to continue implementation of actions identified in the Control Schedule for th 2012 fiscal year; continued the process for securing a repayment contract with Westlands for the recovery of costs of construction of drainage facilities in Westlands; continued to support, through grants, cooperative agreements, and other means, drainage projects requested by districts in the San Luis Unit; and continued to implement the December 2009 Agreement For Continued Use of the San Luis Drain that will allow the Grassland Bypass Project to continue through December 2019.

The "broad discretion" Federal Defendants have been granted to "[create] and [implement] a drainage solution for the San Luis Unit," *Firebaugh*, 203 F.3d at 577, and the various drainage solutions Federal Defendants are undeniably pursuing at this time, do not at present amount to "unreasonably delaying" discrete action required by law within the meaning of section 706(1). "Unreasonable delay" is a relative concept. In *Firebaugh*, the Ninth Circuit recognized that Congress imbued Federal Defendants with "broad authority to "create" a drainage solution; the necessary implication of this holding is that Federal Defendants are to be given sufficient time to exercise reasonable discretion

to create a viable drainage solution.  The Department issued its ROD in 2007, its Feasibility Report in 2008, and its Control Schedule for implementing the drainage solutions identified in 2009; that a drainage system was not yet in place at the time Plaintiffs' filed their motion for summary judgment in October 2010 does not, under the totality of circumstances, constitute unreasonable delay in the context of this case.  It is undisputed that the Department is complying with the Control Schedule, more than ten years after final judgment was entered in the Court of Appeal and fourteen years after final judgment in the trial court.

Over a decade has passed since the Ninth Circuit's decision in *Firebaugh*.  In 2011, Federal Defendants continue to move at a "snail's pace."  The extent of their commitment to provide necessary drainage to the San Luis Unit can be questioned, but Federal Defendants' conduct does not at present constitute unreasonable delay as a matter of law.  Federal Defendants are frustratingly slow, but "general deficiencies in compliance, unlike the failure to issue a ruling . . . lack the specificity requisite for agency action."  *SUWA,* 542 U.S. at 66.  Plaintiffs are legitimately frustrated, as is the court, with Federal Defendants' slow progress in implementing measures to comply with their statutory responsibility to provide drainage.  Nevertheless, an ROD has been completed and Federal Defendants are complying with the Control Schedule.

Plaintiffs are not entitled to summary judgment on their section 706(1) claim, as Federal Defendants are acting to provide the drainage solutions identified in the ROD.  Plaintiffs contempt argument is clearly foreclosed because the court's December 23,

2009 order directs Federal Defendants to "perform their undertakings to the Court, as presented in Part I of the Parties' Supplemental Status Report (Doc. 752) including the Control Schedule," and it is undisputed that Federal Defendants are complying with the Control Schedule.

Plaintiffs are not entitled to a trial "to determine the quantities of drainage waters and contaminants originating from irrigation within the San Luis Unit that have entered Plaintiffs' service areas," because Federal Defendants have no mandatory duty to remediate any such drainage water or contaminants under the San Luis Act. The situation Plaintiffs face is regrettable, but not one that is remediable under the APA. The San Luis Act is not a remediation statute. Plaintiffs' remedy lies with the legislature.

**b. District Defendants Opposition**

District Defendants oppose Federal Defendants cross-motion for summary judgment on the following basis:

> The Federal Defendants have cross-moved in part seeking summary judgment that the "United States has not acted arbitrarily and capriciously, and has acted in accordance with the law, in providing for the installation, operation and maintenance of drainage service facilities in the San Luis Unit of the Central Valley Project, including the Northerly Area and the northern sub-area of Westlands Water District, as set forth in the 2007 San Luis Drainage Feature Reevaluation Record of Decision ["2007 ROD"], the 2009 Record of Decision approving a new Use Agreement for the San Luis Drain and extension for the Grasslands Bypass Project, and in Assistance Agreements with the Panoche Drainage District." (Federal Defendants' Notice of Cross-Motion and Cross-Motion for Summary Judgment, Doc. 826, at 3:3-10.) The District Defendants oppose this portion of the Federal Defendants' cross-motion for summary judgment because it is beyond the scope of the issues framed by the Firebaugh Plaintiffs' operative complaint, and because the arguments in support appear to be directed towards the Plaintiffs' premature request for a hearing on an order to show cause. This summary judgment stage is limited to the legal question of whether the Federal Defendants'

1    duty to construct a drainage system extends to the
2    Plaintiffs' lands, and should not address whether the
     Federal Defendants are complying with the Court's 2000
3    Drainage Order.

4    (District Def's Opp., Doc. 848 at 2).  District Defendants contend

5    that the issues entailed by the parties cross-motions are frozen in

6    time, specifically, in the year 2004:

7         The Plaintiffs' Fifth Amended Complaint was filed June 1,
          2004. Thus, the issue framed by the operative pleadings
8         is whether, as of June 1, 2004, the Federal Defendants
          have fulfilled their drainage obligation to the lands
9         within the San Luis Unit, and to surrounding lands if the
          Court finds that the drainage obligation extends beyond
10        the lands within the San Luis Unit.

11   (Id. at 2).  District Defendants argument is erroneous, as
12
     Plaintiffs' only cognizable claim is that Federal Defendants are
13
     currently withholding discrete action lawfully required by the San
14
     Luis Act; this claim necessarily puts at issue whether Federal
15
     Defendants are currently complying with their duties under the San
16
     Luis Act.
17
          **c. Federal Defendants Motion**
18
          Federal Defendants move for an order granting them summary
19
     judgment on Plaintiffs' APA claims. (Doc. 826, Federal Defendants'
20
     MSJ at 2).  Federal Defendants' cross-motion is GRANTED as to
21
     Plaintiffs' 706(2) claim.  Summary judgment is GRANTED on Federal
22
     Defendant's cross-motion regarding the section 706(1) claim,
23
     without prejudice to a renewed claim based on future circumstances.
24
          **d. District Defendants' Motion**
25
          District Defendants' cross-motion is GRANTED as to Plaintiffs'
26
     706(2) claim.  Summary judgment is GRANTED on Federal Defendant's
27
     cross-motion regarding the section 706(1) claim, without prejudice
28

                                   35

1  to a renewed claim based on future circumstances.

2  **CONCLUSION**

3       Federal and District Defendants' motions for summary judgment

4  on Plaintiffs' claim under section 706(2) are GRANTED. Plaintiffs'

5  motion for summary judgment on their section 706(1) claim is DENIED

6  without prejudice; Federal and District Defendants' cross-motions

7  are GRANTED without prejudice to a renewed claim based on future

8  circumstances. This memorandum decision shall not serve as

9  precedent for the proposition that a duty to provide drainage

10  sufficient to protect Plaintiffs' lands exists under the San Luis

11  Act.

12  IT IS SO ORDERED.

13  **Dated:    September 30, 2011**          **/s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28